IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


ELLAN MAY THOMAS,

        Plaintiff,

    v.                                   Civil Action No.3:07-CV-73


MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A.    Background

      Plaintiff, Ellan May Thomas, (Claimant), filed her Complaint on June 12, 2007 seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) and 1381(c)(3) of an adverse decision by

Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer

on August 16, 2007.[2]  Claimant filed her Motion for Summary Judgment on October 15, 2007.[3]

Commissioner filed his Motion for Summary Judgment on November 9, 2007.[4]

B.    The Pleadings

      1.    Plaintiff's Brief In Support of Plaintiff's Motion for Summary Judgment.

      2.    Defendant's Brief In Support of Defendant's Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 5.

[3] Docket No. 10.

[4] Docket No. 12.

C.    Recommendation

I recommend that:

1.    Claimant's Motion for Summary Judgment be DENIED because the ALJ's determination Claimant's subjective symptoms were not "entirely credible" complied with the legal mandates of Craig v. Charter, 76 F.3d 585 (4th Cir. 1996), and was supported by substantial evidence.  Additionally, the ALJ thoroughly and properly considered Claimant's depression.

2.    Commissioner's Motion for Summary Judgment be GRANTED for the same reasons set forth above.

## II.  Facts

A.    Procedural History

Claimant filed an application for Disability Insurance Benefits on September 15, 2004, alleging disability since October 18, 2000 due to back, leg, and wrist pain, panic attacks, and depression.  Her application was initially denied on May 20, 2005 and upon reconsideration on January 6, 2006.  Claimant requested a hearing before an Administrative Law Judge, ["ALJ"], and received a hearing on January 5, 2007.  On February 7, 2007, the ALJ issued a decision adverse to Claimant.  Claimant requested review by the Appeals Council.  The Appeals Council denied review and Claimant filed this action, which proceeded as set forth above.

B.    Personal History

Claimant was 46-years-old on the date of the January 5, 2007 hearing.  Claimant obtained her GED and has prior work experience as a housekeeper, cook, and cleaner.  (Tr. 43).

C.    Medical History

The following medical history is relevant to the time period during which the ALJ concluded Claimant was not under a disability: October 18, 2000 through February 7, 2007.

**John A. Lyon, M.D., 1/16/01, (Tr. 117)**
Impression: Focal and posterior central disc protrusion at the L5-S1 level lateralizing just slightly towards the left side. The appearance is consistent with a disc herniation. Degenerative disc disease changes seen at the L4-5 and L5-S1 levels.

**John A. Lyon, M.D., 1/16/01, (Tr. 118)**
Impression: No focal disc herniation and no spinal stenosis. Mild diffuse bulging discs seen extending through C4 through C7. Some degenerative facet changes seen in the lower cervical spine.

**United Summit Center, 10/1/02 (Tr. 135)**
Diagnosis:
      Axis I: 296.22 Major Depressive Disorder; Secondary - Cannabis Dep.
      Axis II: 301.7 Antisocial Personality; Secondary - V71.09 No Diagnosis.
      Axis V: 50
Diagnosis Comments and Explanations: Ellan meets the following criteria for major depressive disorder, moderate single episode: helplessness and worthlessness, depressed most of the day, significant weight loss, insomnia, diminished ability to think and concentrate. She has been dependent on cannibus for approximately 22 years. She meets the following criteria for antisocial personality: impulsivity, aggression, disregard for safety towards others, failure to conform to social norms with respect to the law.
Treatment Plan Comments and Explanation: Ellan will be referred for individual counseling for depression. She is currently not interested in substance abuse counseling. However this will be brought up in counseling and an initial treatment plan will be constructed for the first thirty days. She is receiving her medications from her family physician.

**Peggy Allman, M.A., 8/11/03 (Tr. 151)**
Objective symptoms: Restrictive affect, depressed mood, anxiety, sadness and tearfulness during the evaluation.
Diagnostic Impressions:
      Axis I: 293.83 - mood disorder due to chronic pain.
            293.84 - anxiety due to chronic pain.
            303.90 - alcohol dependence in total remission.
            312.34 - intermittent explosive disorder.
      Axis II: 301.9 - personality disorder NOS.
      Axis III: Arthritis in neck, asthma, ruptured and deteriorated disc as reported by claimant.
Prognosis: Prognosis is fair.
Social functioning: Social functioning with the examiner was within normal limits. She visits friends and speaks to them on the phone. She also attends church.
Concentration: Concentration as measured by serial 3's was markedly deficient.

<u>Persistence and pace</u>: Persistence and pace were within normal limits.
<u>Immediate memory</u>: Immediate memory was moderately deficient.
<u>Recent memory</u>: Recent memory was markedly deficient.
<u>Capability of managing finances</u>: If awarded a benefit, she is capable of managing her own finances.

**Joseph Kuzniar, Ed.D., DDS Physician, 9/3/03, (Tr. 156)**
<u>Mental RFC Assessment</u>
<u>Understanding and Memory</u>:
Ability to remember locations and work-like procedure: not significantly limited
Ability to understand and remember very short and simple instructions: no evidence of limitation in this category
Ability to understand and remember detailed instructions: not significantly limited.
<u>Sustained concentration and persistence</u>
Ability to carry out very short and simple instructions: no evidence of limitation in this category
Ability to carry out detailed instructions: not significantly limited.
Ability to maintain attention and concentration for extended periods: moderately limited
Ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances: moderately limited
Ability to sustain an ordinary routine without special supervision: no evidence of limitation in this category
Ability to work in coordination with or proximity to others without being distracted by them: moderately limited
Ability to make simple work-related decisions: no evidence of limitation in this category
Ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without an unreasonable number and length of rest periods: moderately limited.
<u>Social Interaction</u>
Ability to interact appropriately with the general public: not significantly limited
Ability to ask simple questions or request assistance: no evidence of limitation in this category
Ability to accept instructions and respond appropriately to criticism from supervisors: moderately limited
Ability to get along with coworkers and peers without distracting them or exhibiting behavioral extremes: moderately limited
<u>Adaptation</u>
Ability to respond appropriately to changes in the work setting: not significantly limited
Ability to be aware of normal hazards and to take appropriate precautions: not significantly limited
Ability to travel in unfamiliar places or use public transportation: not significantly limited
Ability to set realistic goals or make plans independently of others: not significantly limited

<u>Functional Capacity Assessment</u>: the Claimant retains the capacity to understand, remember, and

carry out a 3 step routine repetitive instruction within a low social interaction demand work setting.  Her capacity to adapt and cope with the work environment is as rated in Section I.D.

**Joseph Kuzniar, Ed.D., DDS Physician, 9/3/03, (Tr. 161)**
Psychiatric Review Technique
Medical Dispositions: RFC Assessment Necessary
Category(ies) upon which the medical disposition is based: 12.04 Affective Disorders; 12.06 Anxiety-related disorders; 12.08 Personality Disorders.
Affective Disorders: Disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by at least one of the following: 1) depressive symptoms evidenced by at least four of the following: sleep disturbance, decreased energy, difficulty concentrating, thoughts of suicide.
Anxiety-Related Disorders: A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: Anxiety disorder.
Personality Disorder: A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: Personality disorder history of antisocial disorder, IED.
Functional Limitation for Listings 12.04, 12.06, 12.08
    Restriction of Activities of Daily Living: Mild
    Difficulties in Maintaining Social Functioning: Moderate
    Difficulties in Maintaining Concentration, Persistence or Pace: Moderate
    Episodes of Decompensation, each of extended duration: None
"C" Criteria of the Listings: Evidence does not establish the presence of the "C" Criteria

**Dr. Diego Ponieman, M.D., 9/10/03, (Tr. 175)**
Neurologic Examination: Strength is normal and symmetric throughout the upper extremities. Strength is normal on the right lower extremities, slightly facing the left.  Sensation is grossly normal in the upper extremities.  Pinprick sensation is diffusely diminished throughout the left lower extremity.  Deep tendon reflexes are 1+ at the knees and absent at both Achilles regions. The gait is minimally antalgic and favors the right leg.  She does not use any cane or other assistive device.  Toe and heel-toe walking is normal.  The patient cannot perform a squat due to back pain.
Diagnoses:
1) Chronic low back pain.
2) Chronic lumbar strain.
3) History of ruptured disk. (I did not have films or MRI report)
4) Signs of radiculopathy on the left.
5) Asthma which is mild intermittent.
6) Anxiety.
7) Depression.  Nor currently suicidal.

**Roberto Cununan, M.D., 9/11/03, (Tr. 178)**

Impression: No acute cardiopulmonary disease.
AP and lateral views of the lumbosacral spine show irregularity of the articulating surfaces of the bodies of L-4 and L-5 with small hypertrophic spur formation and narrowing of the disk space. Otherwise the rest of the visualized lumbar vertebrae appear essentially intact.  There is no bony destructive process.

**Dr. Diego Ponieman, M.D., 9/10/03, (Tr. 184)**
Wrist Range of Motion
       Can the hand be fully extended? Yes
       Can a fist be made? Yes
       Can the fingers be opposed? Yes
       Upper grip strength: 5 (normal is 5/5)
       Grip strength: 5 (normal is 5/5)
       Fine manipulation: normal
Lower extremity muscle strength:
       Right: 5
       Left: 4

**Fulvio Frangutti, M.D., DDS Physician, 9/23/03, (Tr. 186)**
Physical RFC Assessment
Exertional Limitations
       Occasionally - 50 pounds
       Frequently - 25 pounds
       Stand and/or walk  - about 6 hours in an 8-hour workday.
       Sit - about 6 hours in an 8 hour workday
       Push and/or pull - unlimited, other than as shown for lift and/or carry
Postural Limitations: none established
Manipulative Limitations: none established
Visual Limitations: none established
Communicative Limitations: none established
Environmental Limitations: Unlimited
Symptoms: The symptoms are attributable to a medically determinable impairment.
Comments: Patient with history of LBP syndrome, . . . All considered in RFC reduced to medium, because of pain and fatigue.

**Cynthia Osborne, D.O., DDS Physician, 9/23/03, (Tr. 194)**
Physical RFC Assessment
Exertional Limitations
       Occasionally - 50 pounds
       Frequently - 25 pounds
       Stand and/or walk  - about 6 hours in an 8-hour workday.

Sit - about 6 hours in an 8 hour workday
Push and/or pull - unlimited, other than as shown for lift and/or carry
Postural Limitations: none established
Manipulative Limitations: none established
Visual Limitations: none established
Communicative Limitations: none established
Environmental Limitations: none established..
Symptoms: Complains of back pain, leg pain, and __ asthma under good control, PFS normal, ...
Reduce FRC to medium considering complaints of pain.

**James Capage, Ph.D., DDS Physician, 12/31/03, (Tr. 202)**
Psychiatric Review Technique
Medical Dispositions: RFC Assessment Necessary
Category(ies) upon which the medical disposition is based: 12.04 Affective Disorders; 12.06
        Anxiety-related disorders; 12.08 Personality Disorders.
Affective Disorders: Disturbance of mood, accompanied by a full or partial manic or depressive
        syndrome, as evidenced by at least one of the following: 1) depressive symptoms
        evidenced by at least four of the following: sleep disturbance, decreased energy,
        difficulty concentrating, thoughts of suicide.
Anxiety-Related Disorders: A medically determinable impairment is present that does not
precisely satisfy the diagnostic criteria above: Anxiety disorder due to chronic pain.
Personality Disorder: A medically determinable impairment is present that does not precisely
satisfy the diagnostic criteria above: Personality disorder, NOS, Intermittent Explosive disorder
Functional Limitation for Listings 12.04, 12.06, 12.08
        Restriction of Activities of Daily Living: Mild
        Difficulties in Maintaining Social Functioning: Moderate
        Difficulties in Maintaining Concentration, Persistence or Pace: Moderate
        Episodes of Decompensation, each of extended duration: None

**James Capage, Ph.D., DDS Physician, 12/31/03, (Tr. 216)**
Mental RFC Assessment
Understanding and Memory:
Ability to remember locations and work-like procedure: not significantly limited
Ability to understand and remember very short and simple instructions: no evidence of limitation
        in this category
Ability to understand and remember detailed instructions: moderately limited
Sustained concentration and persistence
Ability to carry out very short and simple instructions: no evidence of limitation in this category
Ability to carry out detailed instructions: moderately limited
Ability to maintain attention and concentration for extended periods: moderately limited
Ability to perform activities within a schedule, maintain regular attendance and be punctual

within customary tolerances: moderately limited

Ability to sustain an ordinary routine without special supervision: not significantly limited

Ability to work in coordination with or proximity to others without being distracted by them: moderately limited

Ability to make simple work-related decisions: no evidence of limitation in this category

Ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without an unreasonable number and length of rest periods: moderately limited.

<u>Social Interaction</u>

Ability to interact appropriately with the general public: not significantly limited

Ability to ask simple questions or request assistance: no evidence of limitation in this category

Ability to accept instructions and respond appropriately to criticism from supervisors: moderately limited

Ability to get along with coworkers and peers without distracting them or exhibiting behavioral extremes: moderately limited

Ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited.

<u>Adaptation</u>

Ability to respond appropriately to changes in the work setting: not significantly limited

Ability to be aware of normal hazards and to take appropriate precautions: not significantly limited

Ability to travel in unfamiliar places or use public transportation: not significantly limited

Ability to set realistic goals or make plans independently of others: not significantly limited

<u>Functional Capacity Assessment</u>: MER indicates that the Claimant has severe mental impairments that do not meet nor equal the Listings (See PRT). They do impose moderate limitations upon functioning as reflected by the ratings of Part I, above. It seems that she retains the mental-emotional capacity to perform routine work-like activities in a low-pressure setting that requires limited social interaction.

**<u>Tina M. Yost, Ed.D, 3/21/05, (Tr. 220)</u>**

<u>Mental Status Examination</u>:

<u>Attitude/Behavior</u>: Cooperative

<u>Social</u>: Within normal limits.

<u>Speech</u>: Is delivered in normal tones and is clear. General ability to communicate is considered adequate.

<u>Orientation:</u> She is oriented to person, place, date, and time.

<u>Mood</u>: Mildly depressed. She evidences a sense of humor and laughs frequently during the evaluation.

<u>Affect</u>: Full

<u>Thought process</u>: No abnormalities evidenced.

Thought content: No abnormalities evidenced.

Perceptual: The claimant expresses some vague experience of hearing "like voices." She states she thinks she hears something outside, but is uncertain what it is she thinks she hears. She states this typically happens in the evening.

Insight: Low average to poor.

Judgment: Based on the WAIS-III results, mildly deficient.

Suicidal/Homicidal Ideation: None reported.

Immediate memory: Within normal limits.

Recent memory: Moderately deficient.

Remote memory: Within normal limits.

Concentration: Based on WAIS-III results, moderately deficient.

Psychomotor Behavior: Is generally unremarkable.


Intellectual Assessment:

WAIS-III
- Vocabulary: 7
- Similarities: 7
- Arithmetic: 7
- Digit Span: 4
- Information: 8
- Comprehension: 6
- Picture completion: 4
- Digital Symbol Coding: 5
- Block Design: 9
- Matrix Reasoning: 5
- Picture Arrangement: 7
- IQ Scale: Verbal - 79; Performance - 75; Full Scale - 75
- Index: Verbal Comprehension - 86; Perceptual Organization - 76

WAIS-III Validity: Internal Validity: The claimant is cooperative. She attempts each of the items posed her and appears to put forth good effort. Due to her good effort, these scores are considered internally valid. External validity: The claimant did not complete high school. She was retained in the seventh grade. Overall validity: Overall, the results are considered valid.

Diagnosis: Based on the available information, the following diagnosis is provided:
- Axis I: 311 Depressive Disorder, controlled with medication.
- 305.10, Nicotine Dependence
- 303.90, Alcohol dependence, remission, history of polysubstance abuse.
- Axis II: V62.89: Borderline Intellectual Functioning.
- 301.83: Borderline Personality Disorder.
- Axis III: Chronic Back Pain, by self-report.

Concentration: Moderately deficient.

Persistence: Within normal limits.

<u>Pace</u>: Within normal limits.
<u>Immediate memory</u>: Within normal limits.
<u>Recent Memory</u>: Moderately deficient.

**<u>Diego Ponieman, M.D., 4/18/05, (Tr. 225)</u>**
<u>Physical examination of extremities</u>: no edema. In particular, her knees have significant genu valgum and some loss of mechanical function with mild crepitus on the right but range of motion is still normal. She can walk with no assistive device. She cannot squat for fear that she will not be able to raise. She can do it minimally. She can walk on heels and toes. She can bend forward, etc. For RANGE of MOTION please see chart. She can get on and off the examination table with no problem. There is no atrophy noted in her lower extremities. There is a slight area in her posterior lateral aspect of her thigh where sensation is diffusely decreased. Other than that, sensation is within normal limits in upper and lower extremities. Motor strength is normal in upper and lower extremities. Deep tendon reflexes are normal. Pulses are 2+ throughout.

The patient has some point tenderness mostly in her upper back, intrascapular area, cervical muscles, and also lower back with some muscle spasm in her lower back muscles as well.

<u>Impression</u>
1) Obesity.
2) Depression.
3) Osteoarthritis, mostly involving her knees.
4) Multiple point tenderness.
5) Low back pain syndrome.
6) Degenerative disc disease.
7) Gastroesophageal reflux disease.

**<u>James Capage, Ph.D., DDS Physician, 5/3/05, (Tr. 230)</u>**
<u>Mental RFC Assessment</u>
<u>Understanding and Memory</u>:
Ability to remember locations and work-like procedure: not significantly limited
Ability to understand and remember very short and simple instructions: no evidence of limitation
        in this category
Ability to understand and remember detailed instructions: moderately limited
<u>Sustained concentration and persistence</u>
Ability to carry out very short and simple instructions: no evidence of limitation in this category
Ability to carry out detailed instructions: moderately limited
Ability to maintain attention and concentration for extended periods: moderately limited
Ability to perform activities within a schedule, maintain regular attendance and be punctual
        within customary tolerances: not significantly limited
Ability to sustain an ordinary routine without special supervision: not significantly limited
Ability to work in coordination with or proximity to others without being distracted by them:

not significantly limited

Ability to make simple work-related decisions: no evidence of limitation in this category

Ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without an unreasonable number and length of rest periods: moderately limited

<u>Social Interaction</u>

Ability to interact appropriately with the general public: not significantly limited

Ability to ask simple questions or request assistance: no evidence of limitation in this category

Ability to accept instructions and respond appropriately to criticism from supervisors: moderately limited

Ability to get along with coworkers and peers without distracting them or exhibiting behavioral extremes: moderately limited

Ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited.

<u>Adaptation</u>

Ability to respond appropriately to changes in the work setting: not significantly limited

Ability to be aware of normal hazards and to take appropriate precautions: not significantly limited

Ability to travel in unfamiliar places or use public transportation: not significantly limited

Ability to set realistic goals or make plans independently of others: not significantly limited

<u>Functional Capacity Assessment</u>: MER indicates that the Claimant has severe mental impairments that do not meet nor equal the Listings (See PRTF). They do impose moderate limitations upon functioning as reflected by the ratings of Part I of this form. It seems that she retains the mental-emotional capacity to perform routine work-like activities in a low-pressure setting.


**James Capage, Ph.D, DDS Physician, 5/3/05, (Tr. 234)**

<u>Psychiatric Review Technique</u>

Medical Dispositions: RFC Assessment Necessary

Category(ies) upon which the medical disposition is based: 12.02 Organic Mental Disorders; 12.04 Affective Disorders; 12.08 Personality Disorders.

Organic Mental Disorders: A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: BIF

Affective Disorders: A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: Depressive disorder, controlled with med.

Personality Disorder: Inflexible and maladaptive personality traits which cause either significant impairment in social or occupational functioning or subjective distress, as evidenced by at least one of the following: Persistent disturbances of mood or affect; intense and unstable interpersonal relationships and impulsive and damaging behavior.

Functional Limitation for Listings 12.02, 12.04, 12.08

Restriction of Activities of Daily Living: Mild

Difficulties in Maintaining Social Functioning: Moderate
Difficulties in Maintaining Concentration, Persistence or Pace: Moderate
Episodes of Decompensation, each of extended duration: None
Evidence does not establish the presence of the "C" criteria.
Consultant's Notes: Based on the MER, the Claimant's statements are found to be credible.


**Timothy Huffman, DDS Physician, 5/18/05, (Tr. 248)**
Physical RFC Assessment
Exertional Limitations
Occasionally - 20 pounds
Frequently - 10 pounds
Stand and/or walk - about 6 hours in an 8-hour workday.
Sit - about 6 hours in an 8 hour workday
Push and/or pull - unlimited, other than as shown for lift and/or carry
Postural Limitations: Climbing/balancing/stopping/kneeling/crouching/crawling: occasionally
Manipulative Limitations: none established
Visual Limitations: none established
Communicative Limitations: none established
Environmental Limitations: none established..
Symptoms: Claimant shows history of arthritis/DJD/chronic back/joint pain. ....Gait normal.
Decreased range of motion l-spine. Crepitus of knee noted but range of motion adequate.
Severity of impairments as reported generally supported by MER but would not preclude light
exertional activity.
Treating or Examining Source Statements
Is a treating or examining source statement(s) regarding the claimant's physical
capacities                in file? Yes - Dr. Luketich, 5/5/05
If yes, are there treating/examining source conclusions about the claimant's limitations or
restrictions which are significantly different from your findings? Yes - MSS from
5/05 is not supported by MER and facts/findings.


**Luci Kovacevic, M.D., 7/29/05 (Tr. 258)**
Assessment:
1) Lumbar sprain/strain.
2) Medication follow up.
3) Patellofemoral pain.


**Lisa Benaise, M.D., MPH, 4/22/05, (Tr. 260)**
Objective: She has a normal affect and normal verbalization. Her neck is supple with good range
of motion. Her back shows good flexion and extension, lateral rotation and tilt. There are no
back spasms apparent on examination, although she is tender at the L5 level. Her knees are
tender at the medial collateral ligament bilaterally without obvious deformity., fluctuation,
edema, warmth, or erythema. She has subluxation and has 5/5 strength throughout her upper and
lower extremities with normal range of motion of the knees. She has 5/5 sensation throughout.
Her deep tendon reflexes are 2+ at the brachioradialis, patella and Achilles tendon.

<u>Assessment</u>: Lumbar sprain/strain.

**Edward J. Doyle, M.D., 4/8/05, (Tr. 262)**
<u>Objective</u>: Examination of her low back reveals limited range of motion. There is no spasm. Lower extremity exam reveals normal motor and sensory. She has full range of motion of both knees. She has tenderness along the medial collateral ligament on the left without any signs of ligamentous laxity. Her gait is normal.
<u>Assessment</u>:
1) This is a lady with lumbar sprain and low back pain syndrome. She is stable.
2) She is pursuing disability for a variety of psychological issues, as well as, some pain related issues.
3) She is morbidly obese.
4) She has a past history of alcoholism and treatment, as well as, polydrug use, but not recent problems.
5) She is not a good candidate for opioid medications.
6) She had some problems in the past of GI distress.
7) She has an exam suggestive of possible left knee sprain. She does not have a history or an exam that suggests meniscus injury as there is no locking or giveway of the left knee.

**Edward J. Doyle, M.D., 3/11/05, (Tr. 264)**
<u>Objective</u>: Examination of the lumbar spine reveals no spasm but limited flexion to about 25 degrees, extension to 10 degrees. She is tender to palpation in the paraspinous area, both right and left in the lumbar area. No SI tenderness. Lower extremity examination reveals normal gait. Deep tendon reflexes are 2+ and equal bilaterally. No neurologic changes with motor and sensory evaluation. She has a rash under her axilla going anteriorly along the lower border of her bra. It is a macular/papular and looks to be like an irritant dermatitis.
<u>Assessment</u>:
1) LS sprain.
2) Irritant dematitis, new (recurrent problem), not work related.

**Lisa Benaise, M.D., MPH, 2/11/05, (Tr. 266)**
<u>Objective</u>: Her back shows tenderness to palpation of the L5 to S1 region with no spasm or gross abnormality seen. She has a positive straight leg test at 30 degrees on the right and 40 degrees on the left. Neuro exam of L4 and L5 were intact with knee and ankle reflexes and sensation exam.
<u>Assessment</u>:
1) Lumbar sprain.
<u>Plan</u>: Ms. Thomas needs psychological counseling for her chronic depression.


**Kristin Cummings, M.D., 11/3/04 (Tr. 268)**
<u>Objective</u>:
Neck: supple
Back: There is some tenderness to palpation along the right trapezius and tenderness to palpation

13

in the midline low lumbar spine with tenderness as well in the bilateral paraspinous regions in the low lumbar area.

Muskuloskeletal: reveals good range of motion in the bilateral shoulders. Examination of the wrist reveals mild swelling and tenderness along the lateral dorsal aspect of both wrists, right greater than left. This is somewhat proximal to the wrist joint itself. Examination of the knees reveals crepitus but no swelling and good range of motion. Straight leg raise in thee seated position provokes no back pain, but in the supine position provokes back pain at approximately 50 degrees.

Assessment/Plan: This is a 44-year-old woman with chronic back pain. Her back pain has been exacerbated by a recent return to work with increased physical activity. There is also an emotional component to her multiple complaints with significant stressors at home recently.

Report to Employer: Recommendation: able to work with no limitations, effective 11/3/04.

### Dr. Edward Doyle, M.D., 8/13/04, (Tr. 273)

Objective: Examination of her back revealed the back was straight. There was some mild left-sided paravertebral tenderness and spasm noted on palpation but there was no true spine tenderness on palpation of the spinous processes. Reflexes were 2+ and symmetric in the patellar and Achilles areas bilaterally. Strength was 5+/5 in both proximal and distal muscle groups of the lower extremity. She had negative straight-leg raise. There was positive Waddell sign with trunk rotation and axial loading. Range of motion with fingertips to the mid-calf on flexion and extension to approximately 20 degrees and right and left lateral rotation to approximately 10 degrees bilaterally.

Assessment: Status post low back strain.

### Dr. Gerard DeGuzman, M.D., 7/2/04 (Tr. 276)

Objective: Back examination reveals tender points, which are easily elicited with light palpation basically on her thoracolumbar and sacral paraspinal muscle area. She also has some mild tenderness on palpation on her left gluteus muscle. Extremities are without clubbing, cyanosis, or edema. Neurological examination shows DTRs of 1+ globally, normal gait, SLR is negative bilaterally. MSE reveals no suicidal or homicidal ideation, no hallucinations.

Assessment:
1) Chronic low back pain.
2) History of factitious dermatitis significantly improved.
3) Depression, stable.

### Dr. Gerard DeGuzman, M.D., 5/14/04 (Tr. 280)

Assessment:
1) Chronic low back pain.
2) History of factitious dermatitis, worsened.
3) Depression, stable.

### Dr. Gerard DeGuzman, M.D., 4/23/04 (Tr. 283)

Assessment:
1) Chronic low back pain.

2) History of factitious dermatitis, considerably improved.
3) Depression, stable.

**Dr. Syed Sohail, M.D., 1/23/04, (Tr. 286)**

<u>Objective</u>: On spine examination she has positive Waddell's sign by the following:1) Complaints of pain on axial loading; 2) Complains of lumbar pain on rotation with a fixed pelvis; 3) Increased pain on gentle pressure; 4) Her straight leg raise on the right/left is 60/50 degrees respectively; however, when she is sitting up on the couch with hips flexed to 90 degrees, she has no specific complaints of pain.

<u>Assessment</u>:

1) Factitious dermatitis/fixed drug eruption from ? Zoloft.
2) Chronic low back ache.
3) Depression.

**Dr. Syed Sohail, M.D., 6/30/03, (Tr. 290)**

<u>Objective</u>: On local examination, straight-leg raising on the right was 70 degrees and on the left was 60 degrees. It was positive bilaterally. She has 30% numbness on the left lower extremity in the L3 to S2 dermatone. Her reflexes were normal in both of the knees. Her power was 5/5 in all motor groups.

**Dr. Edward Doyle, M.D., 5/19/03, (Tr. 292)**

<u>Objective</u>: On physical exam today, the patient has increased muscle tone in the paralumbar area. She has decreased flexion and extension. She has normal lower extremity examination. The patient's MRI is reviewed and there is a disk bulge without a frank herniation and without involvement of a nerve root at L5-S1. Note, she has already been evaluated by Dr. Weinstein and determined to be a non-surgical candidate.

<u>Assessment</u>:

1) This is a patient with occupation low back sprain with a permanent partial disability and with no additional increase in impairment.
2) She has a panic attack disorder and it appears that she needs additional treatment for this.
3) She has a past history of alcohol and drug abuse, last using marijuana about four years ago, for this reason she is not a good candidate for ongoing benzodiazepine, nor is she an ongoing candidate for daily narcotic medications. This was mentioned in our prior note.

**Dr. ChuanFang Jin, M.D., 4/28/03, (Tr. 294)**

<u>Objective</u>: On physical examination today, Ms. Miller did not exhibit any acute or physical distress during the visit.. . . She was able to stand up without any assistance from a seated position. She had a normal gait though walked slow. She was able to stand and walk on her toes and heels. Her Romberg test was normal. When I asked her to perform range of motion of her lumbar spine, her motion was very limited. However, one time when something dropped on the floor she picked it up and she bent her back to do that without any squatting. Her flexion of the lumbar spine was close to the normal range. Her straight-leg maneuver was unremarkable, although she reports the same side back pain. Neurologically, she was non-focal.

<u>Assessment</u>:

1) Chronic low back pain syndrome.
2) Lumbar disk disorder.

<u>Plan</u>: Overall, the patient's condition is stable. Because of some complaint of easy irritability and very vague complaints of not feeling good, we will continue her Valium 5 mg three times a day for another month. I spent time to discuss this with the patient, she understood that we are going to try and taper her off the Valium and eventually stop it. Her Vicodin 5 mg will be continued three times a day. A prescription of 90 pills for both medication was given. She is going to be back in one month for follow-up.

### Dr. ChuanFang Jin. M.D., 4/28/03, (Tr. 296)

<u>Objective</u>: She was able to stand up without any help from a certain position. She experienced no difficulty climbing up to examination table, lying down, and getting up. She had a normal gait without any assistive device for ambulation. She was able to stand on her toes but reports difficulty to walk on them. She was able to walk on her heels without difficulty. Range of motion of the lumbar spine was restricted to all directions. She reports she could not squat because of leg pain. Her straight-leg test in the sitting position reveals a 90-degree raise bilaterally with reported back pain on the same side. There was no numbness or tingling during the maneuver. Neurologically, she was nonfocal. She had symmetric deep tendon reflexes of knee and ankle. There were no pathological reflexes elicited.

<u>Assessment</u>:
1) Chronic low back pain secondary to lumbar sprain. Diagnosis code 847.2.
2) Chronic pain syndrome.

### Dr. ChuanFang Jin, M.D., 3/24/03, (Tr. 300)

<u>Assessment</u>:
1) Chronic low back pain syndrome.
2) Lumbar intevertebral disc disorder.

### Stanley Golden, M.D., 10/24/05, (Tr. 303)

<u>MRI Examination of lumbar spine</u>:

<u>Findings</u>: The lumbar vertebral bodies demonstrate preservation of normal height, alignment and signal intensity. Diminished intervertebral disk space height seen at the L4-L5 level and to a lesser extent posteriorly at the L5-S1 level. There is diminished T2 signal intensity in the intervertebral disks compatible with disk desiccation. The conus is at the L1 level.

<u>Impression</u>: Generalized disk bulge at the L4-L5 and central protrusion at L5-S1 without significant central canal or neural foraminal narrowing.

### Philip Comer, Ph.D., DDS Physician, 12/5/05, (Tr. 305)

<u>Mental RFC Assessment</u>

<u>Understanding and Memory</u>:
Ability to remember locations and work-like procedure: not significantly limited
Ability to understand and remember very short and simple instructions: not significantly limited
Ability to understand and remember detailed instructions: moderately limited

<u>Sustained concentration and persistence</u>

Ability to carry out very short and simple instructions: not significantly limited
Ability to carry out detailed instructions: moderately limited
Ability to maintain attention and concentration for extended periods: moderately limited
Ability to perform activities within a schedule, maintain regular attendance and be punctual
    within customary tolerances: not significantly limited
Ability to sustain an ordinary routine without special supervision: not significantly limited
Ability to work in coordination with or proximity to others without being distracted by them:
    not significantly limited
Ability to make simple work-related decisions: not significantly limited
Ability to complete a normal work-day and workweek without interruptions from
    psychologically based symptoms and to perform at a consistence pace without an
    unreasonable number and length of rest periods: moderately limited

<u>Social Interaction</u>
Ability to interact appropriately with the general public: not significantly limited
Ability to ask simple questions or request assistance: not significantly limited
Ability to accept instructions and respond appropriately to criticism from supervisors:
    moderately limited
Ability to get along with coworkers and peers without distracting them or exhibiting behavioral
    extremes: moderately limited
Ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and
cleanliness: not significantly limited.

<u>Adaptation</u>
Ability to respond appropriately to changes in the work setting: not significantly limited
Ability to be aware of normal hazards and to take appropriate precautions: not significantly
    limited
Ability to travel in unfamiliar places or use public transportation: not significantly limited
Ability to set realistic goals or make plans independently of others: moderately limited
<u>Functional Capacity Assessment</u>: Claimant's functional capacity limitations do not exceed
moderate and do not call for a RFC allowance. Claimant retains the mental/emotional capacity
for routine/repetitive activity in a low stress work environment that can accommodate her
physical limitations.


**<u>Philip Comer, Ph.D., DDS Physician, 12/5/05, (Tr. 309)</u>**
<u>Psychiatric Review Technique</u>
Medical Dispositions: RFC Assessment Necessary
Category(ies) upon which the medical disposition is based: 12.02 Organic Mental Disorders;
    12.04 Affective Disorders; 12.08 Personality Disorders; 12.09 Substance Addiction
    Disorders.
Organic Mental Disorders: A medically determinable impairment is present that does not
precisely satisfy the diagnostic criteria above: BIF
Affective Disorders: A medically determinable impairment is present that does not precisely
    satisfy the diagnostic criteria above: Depressive disorder.
Functional Limitation for Listings 12.02, 12.04, 12.08, 12.09.
    Restriction of Activities of Daily Living: Mild

       Difficulties in Maintaining Social Functioning: Moderate

       Difficulties in Maintaining Concentration, Persistence or Pace: Moderate

       Episodes of Decompensation, each of extended duration: None

Evidence does not establish the presence of the "C" criteria.

Consultant's Notes: (See prior PRTF). Claimant's diagnoses and concomitant functional capacity limits complained of not meet or equal listings; however, BIF too moderate B criteria ratings (#s 2,3) call for a RFC Assessment. Claimant's statements are credible from her perspective. (See RFC).

## Dale Luketich, M.D., 5/5/05, (Tr. 335)

Note to DHHR: "To whom it may concern, This is to certify that due to degenerative joint disease, Ellan Thomas is unable to work. This condition may last 1 year."

## Akm Hossasin, M.D., 4/21/06, (Tr. 356)

Diagnoses

Axis I: Major Depressive Disorder (296.32); Generalized Anxiety Disorder (300.00); Nicotine Dependence (305.10).

Axis II: None

Axis III: Back pain; Osteoarthritis; GERD

Axis IV: Psychosocial Stress; Chronic Mental Illness; Poor Social Support.

Axis V: GAF = 61-70%.

Objective: Alert, awake, and oriented. No psychomotor agitation or retardation. Speech: normal. She maintained good eye contact. Concentration was fair. Mood: "I am better." Affect: Congruent with mood. Thought process: Linear and goal-directed. Thought content: No delusions or illusions. Perceptual disturbance: No auditory or visual hallucinations. She denied any suicidal or homicidal ideation. Insight and judgment are fair.

Assessment: Stable psychiatric exam with some headaches secondary to Seroquel.

## Akm Hossasin, M.D., 3/24/06, (Tr. 358)

Mental Status Examination: The patient is alert, awake and oriented to time, place and person. No psychomotor agitation or retardation. Speech was low in volume and rate. She maintained good eye contact but concentration was suboptimal. No delusions or illusions. Thought process was linear and goal-directed. Perceptual disturbance: No visual hallucinations but complained about questionable auditory hallucinations. Mood: "I'm down." Affect is congruent with mood. Insight and judgment are fair.

Assessment:

Axis I: Major Depressive Disorder, recurrent, severe, with psychotic features; Generalized anxiety disorder; nicotine dependence.

Axis II: None

Axis III: Back pain; osteoarthritis; GERD

Axis IV: Psychosocial Stress

Axis V: GAF: 61-70%

Plan: We will refer her for therapy. She will come for another follow-up visit after four weeks.

**George Fredrick, M.D., 11/22/06, (Tr. 433)**
Assessment:
1) Numbness of the left hand and left arm.
2) Hepatitis C.

**George Fredrick, M.D., 10/2/06, (Tr. 435)**
Assessment:
1) Urinary track infection with bladder spasms.
2) Chronic back pain.
3) Bipolar disease.

**George Fredrick, M.D., 9/2/06, (Tr. 436)**
Assessment:
1) History of hepatitis C.
2) Suspect depression and some underlying possible bipolar disease.
3) Low back pain with bulging disk and central protrusion and herniation.
4) Dropped bladder with some incontinence.
5) Abscessed tooth.
6) Arthritis and degenerative disk disease.
7) Possible pilonidal cyst.

**Ansaar Rai, M.D., 9/29/06, (Tr. 443)**
Six radiographs of the lumbosacral spine obtained on 9/29/06. There are no previous radiographs available for comparison.
There are minor calcifications of the aorta. There is no loss of intervertebral disk space height or vertebral body height. Overall alignment of the lumbosacral spine is unremarkable. No evidence of acute fracture is present.
Impression: Unremarkable plain radiograph series of the lumbar spine.

**Kimberly Treat, M.D., 7/31/97, (Tr. 461)**
Labs/Xrays: A cervical spine series shows no acute fractures or injuries. The patient received Percocet one by mouth now and two to go. She had significant relief of her pain with Percocet.
Assessment/Diagnoses:
1) Musculoskeletal neck pain.
2) Status post motor vehicle crash, minor.

**Harmindar Gill, M.D., 7/25/97, (Tr. 467)**
Five views of the cervical spine are obtained including odontoid, AP, lateral, and bilateral oblique films. No prior studies are available for comparison. Review demonstrates no evidence of acute fracture or subluxation to the level of the cervicothoracic junction which is best seen on the bilateral oblique projections. No evidence of prevertebral soft tissue swelling is seen. For a complete study, extension and flexion films in the lateral projection are recommended if clinically warranted.

**Harmindar Gill, M.D., 7/25/97, (Tr. 467)**

Five views of the cervical spine are obtained including odontoid, AP, lateral, and bilateral oblique films. No prior studies are available for comparison. Review demonstrates no evidence of acute fracture or subluxation to the level of the cervicothoracic junction which is best seen on the bilateral oblique projections. No evidence of prevertebral soft tissue swelling is seen. For a complete study, extension and flexion films in the lateral projection are recommended if clinically warranted. A well-corticated osseous density is seen just inferior to the anterior arch of C1 and anterior to the odontoid process and this most likely represents an accessory ossicle.

**Christian Sonnefeld, M.D., 11/28/06, (Tr. 481)**

Impression: This study shows bilateral mild carpal tunnel syndromes. There is no evidence of a left cervical radiculopathy.

**Fairmont General Hospital, Behavioral Medicine Unit, 12/15/06, (Tr. 529)**

Patient presented to ED with complaints of hearing voices. . . . Officers stated they called the patient today and advised the patient that she would be arrested today for felony charges. At that time the patient told the officers that she was going to the hospital to be admitted.

D.    Testimonial Evidence

Testimony was taken at the February 7, 2007. The following portions of the testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ALJ]  (Tr. 548)

Q    How tall are you?

A    I'm not exactly sure. I think 5' 8-1/2".

Q    Okay.

A    I was 5' 9-1/2" until my back injury, but I keep losing like a little bit of inches and quarters of inch.

Q    How much do you weigh?

A    200 - - no, 198.

Q    Has your weight gone up or down significantly during the last couple of years?

A    Yes, ma'am.

Q       How much?

A       At one time I was up to 245.

Q       And down to?

A       163.

                        *                *                *

Q       Do you have a driver's license?

A       Yes, ma'am.

Q       How many miles do you drive in a week about?

A       In a week, probably 20, maybe 40.  It depends.

Q       Did you drive here today?

A       Yes, ma'am.

                        *                *                *

Q       You indicate in your application that your onset date or the date that you became

disabled was October of 2000.  Can you tell me what it is that made you feel theat you became

disabled in October of 2000?

A       That's when I hurt my back.  I was working at Muriel's [phonetic] Restaurant and

I was a house - - I was housekeeper.  They actually made a position for me, because that's what I

had been trained in was housekeeping.  And he called me into the dish house because the

dishwasher didn't show up and I was carrying - - he left me after 45 minutes.  So I had the whole

mini-buffet to do and I was carrying a stack of those heavy pottery plates to the cooks' line.  And

one of those waitresses slopped all that food and stuff.  I stepped off that rubber mat and I slid.

And instead of falling and just letting the stuff go, I did a little dance and I caught my balance.

And I took them on up there and I worked for like a couple more hours.  Then my back started

hurting really bad and I told Kim, the girl that was in the office right there, I told her - -

Q        Did you - -

A        - - I said - -

Q        Did you go to the doctor?

A        Not that day, ma'am.   I thought I had just pulled - -

Q        When did you - -

A        - - a muscle.

Q        When did you go to the doctor about it?

A        That happened on a Wednesday.  I went on Monday morning.

Q        Okay.  What did they do when you went to the doctor?

A        Oh, ma'am, that was six years ago.  I think they did x-rays.

Q        Okay.  And - -

A        And they gave me prescriptions and they told me if it got worse - - I was real

sharp pains down from my - - like right below your waist on my left-hand side - - there is a knot

there - -  down my leg into my foot.  I bent over to get my work clothes out of the drawer and I

couldn't straighten up.  All I could do was cry and scream.  I have never felt pain like that.

That's why I went to the emergency room.

Q        Have you ever had surgery on your back?

A        No.  They sent me to Dr. Weinstein and he said surgery would not help me.  I'd

just be disabled and - -

Q        In your own words, tell me exactly what it is that keeps you from being able to go

out and get a job right now.

A    Well, for one thing, it's hard for me to walk.  My leg gives out.

Q    Okay.

A    I already had to give up my standard shift.  I drove a standard shift since I started driving on the farm when I was six.  And a friend of mine that had hip problems, he told me I'd have to get a cane.  But I - - for the longest time, I fell down.  I'd just fall if I wasn't where I could reach something.  That's why I really - - that - -

Q    Okay.  It's hard to walk.  Now - -

A    Yeah.

Q    - - tell me what else it is that keeps you from being able to work.

A    I'm in constant pain.  I just - - and I'm scared.  I get real paranoid when I'm in public.  Like I feel like people is watching me and I just want to go home.

Q    All right.

A    And then there is other days that I go out, some days I'm fine, you know.  And there is some days that I get depressed and I'll just stay in bed.  I have stayed in bed and not even took a bath for eight days.  My best friend Cindy said she - - I either was going to go take a bath or she was going to drag me in there and bathe me herself which after this accident she had to bathe me.  She had to help me out of bed.  I still require her help getting out of bed.

*          *          *

Q    Tell me about your pain level.  What's it like, let's say on a scale of one to 10?  What hurts you and when and what do you do about it?

A    Okay.  Most of the pain is in my leg and my - - it goes up my back and down my

arm.  They did - - my hands go to sleep.  I have arthritis in my wrist.  And my hands, if I hold

anything very long or like I try to write, they'll go numb.  And my - - the side of my leg stays

numb and it'll get a burning pain in it.  The only thing I have seen that helps it - - ice doesn't

help it.  Heat doesn't help it.  I'm allergic to muscle rubs because I have real sensitive skin and

they break me out in a rash.  So I can't - - that's out.

Q       So what does help?

A       The only thing that helps, if I lay on my right side and elevate my left leg and my

left arm and get it into a comfortable position and just lay there for a little while and - -

Q       Are you - -

A       - - kind of - -

Q       - - being treated for that?

A       Yes.  I just started to a new doctor when I got my medical card and so far I have

hepatitis C.  I have to go to oncology for that to let them see how far advanced that is and I'm

waiting to get in to see a psychiatrist to change my bipolar medication - -

Q       Okay.

A       - - because they have me on Seroquel.  And I told them and told them it was too -

- it wasn't mixing with my body because it knocks me out.  And when I'm out like that, it's - - I

moved around too much and I hurt myself.  I hurt my back twisting and turning.

Q       What is your back pain like on a scale of one to 10, 10 being the worst?

A       It fluctuates.  It - - but it never goes lower than probably about a four, four and a

half, five.

Q       And how high does it get?

A       Oh, it goes to 10, 12 if it was on - -

Q       What do you do when it gets to 10?

A       Usually I just try to take one of the muscle relaxers and anti-depressants.  Because when it starts hurting like that, I get mad and I get - - it brings on a panic attack.  So - -

Q       Have you been hospitalized because of your back or - -

A       No.

Q       - - your panic attacks, I mean, a hospital stay that lasted several days or weeks?

A       No, ma'am.  I was - - I debated on staying the 15th when I went to Fairmont General, but I'd rather do therapy, this outpatient therapy, because I don't like to be around a group of people.

*                    *                    *

Q       Do you do any shopping?

A       Just for necessities and - -

Q       What about cleaning?

A       Oh, cleaning is a good one.  I have to do a little bit at a time.  Like, I have to wash my dishes.

Q       Are you able - -

A       I do - -

Q       - - to shower - -

A       - - a few - -

Q       I'm sorry.  Go ahead.

A       I can do a few and then I'll have to go sit down and rest and then go back and do a

few.  I tried that trick, put your leg up on the step, you know, open the cabinet door.  It don't work.

Q       Do you do - -

A       I tried that.

Q       - - any cooking?

A       Just - - no, not really, unless I can put it in the oven and bake it or put it in the microwave.

Q       Do you - - are you able to shower and take care of your hair, things like that?

A       It's difficult but I do it.  I have a hard time in the shower.  There is a board there I can grab a hold of.

Q       Have any hobbies that keep you busy?

A       I watch a lot of Christian television and - -

Q       And - -

A       - - I did read, but my eyes are going.  My arms aren't long enough as they say anymore.  So I got some magnifying glasses that somebody gave me so I can read my Bible.

Q       Any activities outside the home such as clubs or church or anything like that?

A       I go to church on Sundays when I can.

Q       Visit with any friends or relatives?

A       My sister-in-law once in awhile.

Q       Take any trips with your fiancé or family members or friends?

A       No.

Q       Do any laundry?

A      Not unless I absolutely have to and then I try to lean on the washer and take my good foot and use my toes to pick up the clothes.

Q      Are you able to carry any groceries inside?

A      Yeah.  I have them bag them like in small bags, a little bit in each bag.

Q      Do you have any pets?

A      No.

Q      How far can you walk?

A      I don't know.  I have never - - I don't really try to walk outside the house.  I walk back and forth in the trailer.  Because if my leg gives out, I have to have something to grab a hold of.  I had talked to Dr. Frederick [phonetic] about getting a cane and he said we'd discuss it the next time that we - - I seen him.

Q      How long can you stand without having to sit?

A      It varies, 10, 15 minutes.  It's all according to - - most of it - - half of it's according to the weather and I know I have arthritis in my neck.

Q      How long can you sit without having to stand?

A      About the same time, anywhere from five to 15 minutes.  I have to stand up and go get in the chair.  I have a love seat and a chair now.  And I'll kind of just rotate.

Q      Any type of exercises that you do at home?

A      I try to do those stretching exercises with your legs.  They said it helps.  I get real bad pain from the bottoms - - like behind my kneecap down to my feet they'll hurt.  I mean, when it starts hurting, it hurts like - - it don't stop.  It's a deep, like a deep pain, a - - I don't know how to describe it, like a constant like burning like pain.

Q      All right.

A      And it doesn't last for any amount of time.  It might last that night.  It might last for three days.  It might last for a couple hours.  And nothing I found helps it, rubbing it, massaging it.  I have even took my fists and beat on my legs to try to get them to quit hurting.  It doesn't help.  Walking, I - -

*                    *                    *

[EXAMINATION OF CLAIMANT BY ATTORNEY]  (Tr. 566)

Q      As far as the depression, are you having crying spells?

A      Yeah.  I go through different phases.  Yeah, I cry and then I get mad.  And then I cry some more and - -

Q      How often do you go through those phases that you're referring to?

A      Every couple of days.  Sometimes it can be that day - - I could be okay that day and then just see something or hear something that reminds me of something and I just, you know - -

Q      Okay.

A      And hearing the voices, hearing what they are saying, that just started on the 15th.  I could never hear the voices before.  It was like somebody was talking but they - - I couldn't hear what they were saying.  I couldn't hear the words.

Q      Okay.  When did you start having the hallucinations that you're referring to?

A      Hearing - -

Q      Do you remember how - -

A      - - the voices?

Q        - - long ago?  Yes.

A        Oh, I have heard voices like that I couldn't hear what they were saying for, I don't know, 20 years.  Everybody just said I was crazy.  I said, no, I hear somebody talking.  They'd all laugh.  Oh yeah.  Okay.

Q        Okay.

A        They just thought I was nuts [INAUDIBLE] I guess, you know.

Q        How often are you having the hallucinations?

A        Usually about once a week.  Sometimes I hear - - you know, I can hear my grandmother and telling me it's going to be all right.  Come on.  Let's go up to my house, because she used to take me to her house and make me rice pudding.

Q        Okay.  All right.

A        That's the only sane part of my childhood, you know.

Q        All right.  How do you sleep?

A        How do I sleep?

Q        Um-hum.

A        What do you mean how do I sleep?

Q        Do you sleep well, not well?

A        No, not well at all, until my body gets just so exhausted it just shuts down and I sleep for about maybe six, eight hours.

Q        Okay.  Are you sleeping six to eight hours a day or are you going long stretches without sleeping?

A        No.  I'll go two or three days and sleep an hour or two maybe.  And then it'll all

catch up with me and my body will just shut down.  And I'll go to sleep for maybe six hours, eight hours.

Q        Okay.  How is your ability to concentrate and your memory?

A        Terrible.

Q        Give me some examples.

A        Well, I have to put a reminder for appointments on my phone for the day before and then for the day before, I have to move them up to the next day and set it for like an hour before so I don't miss it, because I forget stuff.  Like, I forgot those papers I was supposed to bring you.

Q        Okay.

A        And they were laying right there.

Q        Okay.  Do you have suicidal thoughts?

A        I just started to on the 15th or on the day after Thanksgiving.

                        *                *                *

Q        Do you have problems with paranoia?

A        Yeah.  I feel like people are watching me, staring at me.

Q        How do you get along with others?

A        It depends on if I know them.  If I know them, okay, but I don't want to be around them for no long period of time.  That's just, you know - -

                        *                *                *

Q        All right.  Do you have panic attacks or anxiety attacks?

A        Yeah.

Q       How often do you have those?

A       Oh, probably at least once a day, a varying degree.  Sometimes I'll just - - like now, I'm having a mild one now and my heart's beating real fast.  I'm shaky.  I'm jumping.   I'm - -

Q       Okay.

A       It's - - but I am starting to sweat a little bit if you can tell.

Q       Okay.  Does anything in particular cause a panic attack?

A       No.  I think they just - - I don't know, not that I know of.  I know if something upsets me I have one and they are pretty major.

Q       Okay.   How long do they generally last?

A       Anywhere from five to 15 minutes.

Q       Okay.  And how do you feel after a panic attack?

A       Drained, just drained, just emotionally, physically drained.

                    *                    *                    *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]  (Tr. 576)

Q       Would you characterize the Claimant's prior relevant work?

A       Yes.  Her work as a housekeeper and cleaner, she had that at two locations there were - - it was medium and unskilled, Your Honor.

Q       All right.  If you take a hypothetical person the Claimant's age, education and background and work experience who can do a range of medium work; no ropes, ladders - - no climbing of ropes, ladders or scaffolds; no constant reaching or lifting overhead; cannot work in an environment where food is handled for consumption or in the health care industry; no

constant fine manipulation; also needs a low stress environment, by that I mean entry level, unskilled, routine and repetitive work, working with things rather than people, simple instructions and simple decision making; and maybe two extra bathroom breaks of a very short duration during the day, the workday. Could that hypothetical person do the Claimant's prior relevant work?

A    I don't believe that would eliminate that - - the prior work with that hypothetical, Your Honor.

Q    All right. Are there other jobs at that level at which such a hypothetical person could perform?

A    At the medium level, that hypothetical individual, Your Honor, I believe could function as a laundry worker, medium, 375,000 nationally and 1,875 regionally or as a hand packer, 375,000 nationally and 2300 regionally.

Q    At the light level, if you add a sit/stand option and occasional posturals, would there be any jobs that such a hypothetical person could perform with those additional limitations?

A    At the light level, Your Honor, that hypothetical individual I believe could function as an office assistant, 150,000 nationally, 1,875 regionally or as a machine tender, 327,000 nationally, 2500 regionally.

Q    And at a sedentary level?

A    At the sedentary level, that hypothetical individual could function, I believe, as a general sorter, 50,000 nationally, 650 regionally or also machine tender at the sedentary level with just a reduction in the weight, 141,000 nationally, 1400 regionally.

Q      All right.  In any of these jobs that you have given me, does the person have constant contact with the public - -

A      No, Your Honor.

Q      - - or frequent contact with the public?

A      No, Your Honor.

Q      Okay.  Ms. - - I'm sorry.  I forgot to ask.  If a person is off task due to pain or lack of concentration, persistence or pace, how much time would be tolerated off task by these entry-level job employers?

A      If a person is going to reach double digits, 10 percent or more, then that's going to be a problem with any of these jobs, Your Honor.  That's ongoing.

Q      All right.  And absenteeism?

A      If a person is going to miss two or more days per month, I believe they would attempt to have that corrected and if not corrected, it would result in termination.

Q      Is your testimony consistent with the Dictionary of Occupational Titles?

A      I believe it is, Your Honor.

                    *              *              *

[RE-EXAMINATION OF CLAIMANT BY ALJ]  (Tr. 579)

CLMT      You told me to tell you if I remembered any - - I can't bend over either.

ALJ      Okay.

CLMT      I can only bend a certain degree.  That's why I have to lean against the washer and like scoot what I want with my foot or throw it in there.

ALJ      All right.

CLMT          Because if I bend too far, it's bad news.  I pulled something.

                              *               *               *

E.          Lifestyle Evidence

          The following evidence concerning the Claimant's lifestyle was obtained at the hearing

and through medical records.  The information is included in the report to demonstrate how the

Claimant's alleged impairments affect her daily life.

•          Prepares breakfast (muffin, toast, coffee, tea, juice).  (Tr. 60)

•          Prepares dinner (sandwich, baked potato, meat, vegetable).  (Tr. 60)

•          Unable to do housework.  (Tr. 60)

•          Shops for foods, clothing, books, magazines, medication, cigarettes.  (Tr. 61)

•          Shops for 20 minutes at the most, sometimes with roommate.  (Tr. 61)

•          Reads books 2-3 hours per day.  (Tr. 61)

•          Watches television 4-5 hours per day.  (Tr. 61)

•          Listens to radio/records/tapes 1 hour per day.  (Tr. 61)

•          Attends church services for 5-7 hours.  (Tr. 61)

•          Visits pastor and friends occasionally.  (Tr. 62)

•          Leaves house 4-5 times per week.  (Tr. 62)

•          Has no problems getting along with other people.  (Tr. 62)

•          Has problems concentrating.  (Tr. 62)

•          Able to follow most instructions.  (Tr. 62)

•          Is 5'9" tall and weighs 220.  (Tr. 71)

## III.  The Motions for Summary Judgment

A.      Contentions of the Parties

Claimant alleges the ALJ erred in evaluating the credibility of her allegations of pain, limitations, and disability.  Claimant also alleges the ALJ failed to adequately address her depression.  Commissioner argues the ALJ complied with controlling regulations and case law in assessing Claimant's credibility and sufficiently considered Claimant's mental impairments.

B.      The Standards

1.      Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 569(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."  Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.      Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See, 42 U.S.C. §§ 405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.      Social Security - Medically Determinable Impairment - Burden. Claimant bears

the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. §§ 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.      Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. §§ 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of his insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.      Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly

indicates the weight given to all of the relevant evidence. <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

        8.     <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

        9.     <u>Social Security - Sequential Analysis</u>.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform his past work, the burden shifts to the Secretary to show that the claimant can perform some other job.  <u>Rhoderick v. Heckler</u>, 737 F.2d 714-15 (7th Cir. 1984).

C.     <u>Discussion</u>

        1.     <u>Whether the ALJ Properly Evaluated the Credibility of Claimant's Subjective Complaints of Pain and Limitation</u>.

        Claimant alleges the ALJ erred in assessing the credibility of her alleged symptoms of pain and limitations.  Commissioner argues the ALJ's evaluation of Claimant's credibility was proper.

        The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints

in Craig, 76 F.3d at 585. Under Craig, when a claimant alleges disability from subjective symptoms, she must first show the existence of a medically determinable impairment that could cause the symptoms alleged. Id. at 594. The ALJ must "expressly consider" whether a claimant has such an impairment. Id. at 596. If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements about her symptoms, in determining whether the claimant is disabled. Id. at 595. While the ALJ must consider the claimant's statements, he need not credit them to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged. Id. However, subjective symptoms "may not be dismissed merely because objective evidence of the pain itself . . . are not present to corroborate the existence of pain." Id. As long as the ALJ followed the legal mandates of Craig, his factual determinations will be upheld so long as they have substantial evidence to support them. Milburn Colliery Co., 138 F.3d at 528.

In the present case, Claimant alleges pain in her back, legs and arms and psychological impairments prevent her from working. (Tr. 553-568). While the ALJ found Claimant's impairments could "reasonably be expected to produce the alleged symptoms, . . . the claimant's statements concerning the intensity, persistence, and limited effects of these symptoms are not entirely credible." (Tr. 21). The ALJ's conclusion rested, in part, on 1) the "lack of support of the objective medical evidence, such as her MRI's that showed degeneration and herniation, but no clear evidence of encroachment;" 2) her daily activities including "shopping, driving, visiting with friends, attending church, cooking, doing laundry, and taking walks;" 3) the fact Claimant did not follow prescribed medical treatment for her pain because she had not followed medical

advice to stop smoking.  (Tr. 21).

The Court finds the ALJ's assessment of Claimant's credibility is supported by substantial evidence, as is his reliance on the medical record, Claimant's lifestyle evidence and smoking habits.  First, pursuant to Craig, the ALJ looked to the medical record and reasonably concluded it did not support the severity of pain and limitations alleged by Claimant.  Although the records establish Claimant suffered a work-related back injury in 2000 and was diagnosed as having a lumbar sprain/strain, chronic low back pain, and found to suffer from disc protrusion and herniation, (Tr.  117, 118, 175, 225, 264, 266, 273, 276, 280, 283, 286, 294), the record also shows Claimant was consistently observed by physicians to walk without any assistive device, have a normal heel-to-toe walk, and retain the RFC to complete light to medium work.  (Tr. 175, 186, 194, 248, 262, 264, 276).  Similarly, while the records established Claimant suffered from mental impairments including depression and anxiety-related disorders, (Tr. 151, 161, 175, 202, 266, 280, 283) they also established Claimant retained the mental/emotional ability to work in a low stress/low-social interaction/low-pressure environment.  (Tr. 156, 216, 230, 305).

Regarding Claimant's assertion the ALJ improperly substituted his own opinion for those of doctors by noting the absence of "encroachment," the Court finds the ALJ's reference was proper, because the ALJ is permitted to consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence."  20 C.F.R. § 404.1529.  The ALJ may also consider "the degree to which the individual's statements are consistent with the medical signs and laboratory findings."  SSR 96-7p.  The ALJ's reference to the absence of "encroachment" was therefore a proper comment on the conflict between Claimant's retained range of motion and strength and Claimant's allegations

of pain and limitations.

Second, the ALJ reasonably looked to Claimant's lifestyle evidence and properly concluded Claimant's ability to drive, prepare meals, attend church, visit her pastor and friends, and shop for 20 minutes at a time was inconsistent with the severity of pain and limitations she alleged. (Tr. 21, 60, 61, 62). See Craig, 76 F.3d at 595 [holding, "evidence of the claimant's daily activities should be considered"]; see, also, Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992).

Finally, the ALJ properly relied on the contradiction between Claimant's complaints of pain and her choice in March 2005 to forgo pain medication because it would require her to quit smoking. (Tr. 262). In Mickeles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994), the Fourth Circuit stated that "an unexplained inconsistency between the claimant's characterization of the severity of her condition and the treatment she sought to alleviate that condition is highly probative of the claimant's credibility." See, also, 20 C.F.R. § 404.1529(c)(4). Thus, it is appropriate "for the ALJ to consider the level and type of treatment the plaintiff sought and did or did not receive in determining what weight to accord" to subjective allegations. Baldwin v. Barnhart, 444 F. Supp. 2d 457, 464 (E.D.N.C. 2004). Based on Mickeles and Baldwin, the Court finds the ALJ reasonably relied on Claimant's decision to forgo pain medication in favor of continued smoking as evidence her symptoms were not as serve as she alleged. (Tr. 21).

For the above reasons, the Court finds the ALJ complied with the legal mandates of Craig and his factual determinations concerning Claimant's credibility are supported by substantial evidence.

2.    <u>Whether the ALJ Accurately and Sufficiently Considered Claimant's Depression.</u>

Claimant alleges the ALJ did not properly address her depression.[5]  Specifically, she alleges, "Finally, the ALJ doesn't address the depression issue.  Here we have an individual who has periods of crying, who stays in bed for eight days at a time without bathing, and who hears voices that aren't there.  To be certain, such a profile would at least interfere with work, and Ms. Thomas is entitled to have that considered."  Commissioner, in addition to properly noting the brevity of Claimant's argument, responds the ALJ properly considered Claimant's mental impairment when determining Claimant's RFC.

The Court agrees with Commissioner and finds the ALJ sufficiently and properly considered Claimant's depression throughout his analysis.  <u>First</u>, when summarizing Claimant's medical history, the ALJ repeatedly made note of Claimant's diagnosis of depression and other mental disorders.  (Tr. 16-18).  <u>Second</u>, in concluding Claimant's psychological impairments did not meet or equal a listing, the ALJ conducted an extremely thorough analysis of Parts A, B, and C of Listings 12.04, 12.06, and 12.09.  (Tr. 18-19).  Specifically, he noted Claimant's history of depression and mental impairments, (Tr. 16-18), but ultimately, and reasonably, found significant the fact she engages in a range of activities of daily living, has only moderate limitations in social functioning, concentration, persistence and pace and does not experience repeated episodes of decompensation.  (Tr. 18-19, 151, 151, 202, 216, 220).  <u>Third</u>, in concluding Claimant was not disabled and assigning her an RFC of a limited range of light work, the ALJ reasonably relied on the numerous Psychiatric Review Technique Forms and Mental

---

[5] Claimant alleged the present issue in the last paragraph of his first argument.  From the Court's perspective, it is better to separate these issues under separate headings to make sure they are adequately addressed by the Court.

RFC Assessments in the record that established Claimant retains the mental/emotional ability to work in a low stress/low-social interaction/low-pressure environment. (Tr. 21, 156, 216, 230, 305). The Court finds that although Claimant suffers from depression and other psychological impairments, the ALJ carefully reviewed the record and concluded her mental impairments, so long as they are accommodated by the proper work environment, are not disabling.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be DENIED because the ALJ's determination Claimant's subjective symptoms were not "entirely credible" complied with the legal mandates of Craig, 76 F.3d 585, and was supported by substantial evidence. Additionally, the ALJ thoroughly and properly considered Claimant's depression.

2.      Commissioner's Motion for Summary Judgment be GRANTED for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.


DATED: January 23, 2008

<u>/s/ James E. Seibert</u>
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE